# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| REBECCA ANN GOETZ, | ) |
| | ) |
|     Plaintiff, | ) |
| v. | )  No. 4:23-cv-00031-SEP |
| | ) |
| KIMBERLY GARDNER, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM AND ORDER

Before the Court are Defendants' motions to dismiss, Docs. [22], [25]. The motions are fully briefed and ready for disposition. *See* Docs. [23], [24], [27], [28], [32], [35], [36]. For the reasons set forth below, the motions are denied.

### FACTS AND BACKGROUND[1]

On October 6, 2021, Plaintiff started working at the Circuit Attorney's office of the City of St. Louis as a Diversion Specialist. Doc. [16] ¶ 25. The "diversion program" is "an alternative to the traditional criminal justice system, designed for low risk offenders." *Id*. ¶ 28. Participants attend classes and training, and once a participant successfully completes the program, the participant graduates and the charges are dismissed. *Id*. Before her employment with the City, Plaintiff had 23 years of experience as a probation and parole officer for the State of Missouri's Division of Probation and Parole. *Id*. ¶ 29.

On April 2, 2022, Circuit Attorney Gardner gave Plaintiff a $5,000 raise. *Id*. ¶ 30. Shortly thereafter, Plaintiff arranged for students to come visit the courthouse and the Circuit Attorney's office. *Id*. ¶¶ 37-40. A.H., a young black man and participant in the diversion program, spoke at the field trip. *Id*. ¶¶ 42, 45. While he spoke, A.H. "struggled to deliver a coherent and polished presentation." *Id*. ¶ 46. Defendant Serena Wilson Griffin, holding the title of "First Assistant" in the Circuit Attorney's office, had two of her children attend the field trip. *Id*. ¶¶ 11, 52. Her children witnessed A.H.'s presentation and "made a video in which they impersonated A.H. and mocked the way he talked to the students on the field trip." *Id*. ¶ 53.

---

[1] For purposes of the motions to dismiss, the Court takes the factual allegations in the Amended Complaint, Doc. [16], to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

1

Before the field trip, A.H. told her that he and Victor H. Martin, a contract employee for the City who serves a mentor in the diversion program, had been "hanging out." *Id*. ¶¶ 43, 44.

On May 4, 2022, during a WebEx meeting, Circuit Attorney Gardner announced that she had seen the video and had concluded A.H. was "not on track" to graduate." *Id*. ¶¶ 54, 55. First Assistant Griffin and Mentor Martin "echoed Gardner's statement that A.H. was 'not on track.'" *Id*. ¶¶ 35, 59. Plaintiff believed that A.H. deserved to graduate, and she was concerned that A.H. was being "punished for his poor public speaking skills, and worse, for the way Griffin's children had presented him in their video." *Id*. ¶¶ 57, 58. First Assistant Griffin also stated that A.H. had lied when he told Plaintiff that he and Mentor Martin were "hanging out." *Id*. ¶ 60.

After the WebEx, Plaintiff spoke with A.H., who told her that Mentor Martin had taken him to Hooters. *Id*. ¶¶ 61, 62. Plaintiff discussed A.H.'s situation with Jamie Myers, the Prosecuting Attorney for the Diversion Program. *Id*. ¶¶ 63, 67. Attorney Myers worked with Plaintiff and "at times exercised some degree of supervisory authority over Plaintiff." *Id*. ¶ 66. After her conversation with Attorney Myers, Plaintiff "prepared an email to send to Gardner and Griffin assuring them that A.H. was on track to graduate from the Diversion Program." *Id*. ¶ 68. In the email, Plaintiff "urged that the office shouldn't punish a young man for poor presenting skills, and that holding him back because of a mocking video arguably constituted cyber bullying." *Id*. Plaintiff showed the email to several other employees who each commented "that the email was well-written and satisfactory to send to Gardner." *Id*. ¶¶ 71, 72. Plaintiff then sent the email to Circuit Attorney Gardner. *Id*. ¶ 73.

On May 18, 2022, Mentor Martin, who is black, yelled at Attorney Myers, who is white, about the wording on a proposed diversion program graduation certificate. *Id*. ¶ 74. Martin claimed that the words "Felony Redirect" on the certificate "sounded like prison language," and told Myers that she had "noodles for a brain" and was "acting like a slave owner." *Id*.

The next day, a meeting was held to discuss A.H.'s situation. *Id*. ¶¶ 76, 77. Circuit Attorney Gardner told Plaintiff that she would prefer that Plaintiff not "write things out," and instead "just come talk to [her]." *Id*. ¶ 80. During the meeting, Martin denied "hanging out" with A.H., and First Assistant Griffin told Plaintiff that she "did not understand Black vernacular." *Id*. ¶¶ 81, 82. Griffin told Plaintiff that "in Black vernacular 'hanging out' meant being together 'multiple times' and did not have a positive connotation, and implied participation in inappropriate activity." *Id*. ¶ 83. Plaintiff "questioned how one should decide what words

mean," and then she became emotional. *Id*. ¶ 84.  Circuit Attorney Gardner asked Plaintiff what was going on, and Plaintiff described the interaction between Mentor Martin and Attorney Myers the night before. *Id*. ¶¶ 85-86.  Mentor Martin repeatedly interrupted stating, "All you do is act like slave owners."  When Plaintiff questioned Mentor Martin's statement, he said:  "You will never know how to help these people.  You are not Black.  The only reason these people are doing good is because of me." *Id*. ¶¶ 88, 89.

The group then moved on to discuss a client who had not paid the court costs required under the program. *Id*. ¶ 90.  Mentor Martin again called Plaintiff and Attorney Myers slave owners. *Id*. ¶ 91.  Martin told Plaintiff that she will never understand the participants because she is not black. *Id*. ¶ 93.  Plaintiff then stated, "I'm feeling attacked because I'm not Black." *Id*. ¶ 94.  Mentor Martin continued to call Plaintiff a slave owner and told her she would never help the participants. *Id*. ¶ 96.  Plaintiff claims that Circuit Attorney Gardner and First Assistant Griffin did not stop Mentor Martin from making the accusations; instead, they "sat in silence and allowed Martin to repeatedly direct these inappropriate racialized statements to Plaintiff." *Id*. ¶ 97.  Eventually Gardner stated, "Obviously, there is some racial tension.  I'm going to call in Mr. Waheed.  He's used to addressing these types of situations." *Id*. ¶ 98.  Gardner and Griffin then left the room. *Id*. ¶ 99.  When Waheed entered the room, he asked what happened and Plaintiff explained that she was being attacked because of her skin color. *Id*. ¶¶ 100-05.  Waheed told her that "the office must protect Gardner because she is a Black elected woman with a new agenda and people who don't like it," and asked Plaintiff if she "understood that because of her White privilege, [she] [would] never experience racism." *Id*. ¶¶ 106, 107.  Waheed then went on to justify Mentor Martin's discriminatory statements. *Id*. ¶ 115.  Plaintiff claims that Gardner "reasonably anticipated the kinds of things Waheed would say and that his statements would be racially inappropriate and discriminatory." *Id*. ¶ 119.

Later in the day, "Waheed went to Plaintiff's office and said words to the effect of:  I want to see how you are doing.  I'm sorry . . . Do you identify as Latino? . . . Only Blacks and Latinos experience racism." *Id*. ¶ 122.  Waheed continued to talk about racism and Plaintiff "responded with words to the effect of:  What if I wanted to identify as Black?  What does that have to do with anything?  You don't know who I am as a person.  You don't know what I went through in life.  Does it matter how I identify?" *Id*. ¶ 125.

3

The next day, First Assistant Griffin told Plaintiff that she had been placed on administrative leave pending investigation into texts Plaintiff had sent. *Id*. ¶¶ 127, 128. Plaintiff explains that following the May 19th meeting, Plaintiff sent several texts to Attorney Myers. *Id*. ¶¶ 132-34. She provides the following excerpts:

1. My mission is not necessarily to quit, although I am not afraid of being fired anymore as I realize that may be the only way to get the change started that needs to happen. I want to help be the change and I know I am pure in my thoughts and intentions..i have spent years in self introspect looking at who I am and what i do and although i know that my personality may need a lot of alterations(which, believe it or not, I do try to change [smile face Emoji]), I also know my heart is pure and does not judge someone based on the color of their skin. My mission has changed. As hard as it was, I am so glad out of all of this occurred (although I am truly sorry I pulled you into it. I would have rather had Mr. Vic just solely attack me and leave you out of this) The good that did come out of this was that Mr. Vic's lies and Serena's BS did not hold ["A.H.", Redacted Name of Diversion Program Participant] from graduating when he is as Ms. Gardner stated that although she had said it during the meeting, she was not going to really do that to him. That was a big win. My next goal is getting Mr. Vic out of the program. He is corrupt and all he does is spew hatred around. He is not benefiting anyone by continuously talking about how grand he is and how he MURDERED someone, but is now is allowed to walk around this community and is a "miracle". By him proudly repeating and justifying those indignant racial slurs, he has shown his INTENT.

2. And as Redditt pointed out so graciously, he believes the true meaning behind prejudice is what someone's actual INTENT was. So, as Serena so graciously attempted to try to play lawyer with all of this, I have decided I will be contacting a lawyer regarding the matter and see if that helps them see that Mr. Vic has no business in being in the position he is. I don't wish him ill, but he needs to be placed in a position where he is not allowed to influence the youth in this world.

3. Well, just so you are aware, when Serena called me this afternoon, she stated I was under investigation for threats I had made in a text that i sent to you earlier today. She stated I was on unpaid leave until the investigation ended and I can not come into the office and am locked out of all computer systems effective immediately. She said thr [sic] investigation would include going through the text line by line. She said you would be interviewed separately regarding the email. I just curious which specific one she was referring to. I not worried about what I sent because, once again, my intent was talking to someone I thought was a friend. I had no idea it would be seen by anyone else.

4. I don't want to talk right now, but I do have one huge thought weighng [sic] on my mind that I can't get over. How are we EVER to get past anything in this country if we are allowing someone to mentor our youth who outwardly expresses his distrust and hatred for people just because of their skin color. He is being idolized by these kids for killing someone and making it out of the system, yet is outwardly telling them that it is OK to have hatred for someone based on their color and to not trust them based on that color. Nothing can ever change in this world if these are the type of people mentoring our youth and if those they are working for are just brushing it under the table. What Mr. Vic said

4

>about you was unacceptable, but for him to be proud of his behavior and to continuously repeat those phrases over and over was too much for me to handle. He then openly admitted those comments were meant for both of us because we can never understand any one of these participants just because of the color of our skin, but in a much more derogatory and hurtful way. Mr. Vic is NOT helping St Louis heal and to work towards fixing the injustices that Ms. Gardner is trying to address by creating these programs. He is doing so much more damage than I ever could have believed and I can't ever imagine continuing to work in a program where we are putting up barriers rather than working together to help heal the injustices that have been created so long ago.

*Id*. ¶¶ 144-45.  Plaintiff claims that Attorney Myers "wrote texts of an equivalent nature, including on May 18 and 19, 2022," but she was not fired.  *Id*. ¶¶ 159-60.

Because Plaintiff was on administrative leave, she stayed home the week of May 23, 2022.  *Id*. ¶ 161.  On May 26, 2022, First Assistant Griffin called and told Plaintiff she was terminated.  *Id*. ¶ 162.  Plaintiff never received a reason for her termination.  *Id*. ¶ 165.

Plaintiff filed this lawsuit on January 10, 2023.  *See* Doc. [1].  After several Defendants moved to dismiss, Plaintiff filed an amended complaint that includes the following counts:

>Count I:  Title VII – Discharge Based on Race (against the City of St. Louis)
>
>Count II:  Title VII – Retaliation Based on Race (against the City of St. Louis)
>
>Count III:  42 U.S.C § 1981 – Discharge Based on Race (against Circuit Attorney Gardner and First Assistant Griffin in their individual capacities)
>
>Count IV:  42 U.S.C § 1981 – Retaliation Based on Race (against Circuit Attorney Gardner and First Assistant Griffin in their individual capacities)
>
>Count V:  42 U.S.C. 1981 – *Monell* Liability (against the City of St. Louis)

*Id*. ¶¶ 217-49.  Defendants move to dismiss.  *See* Docs. [22], [25].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to give "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.544, 570 (2007)).

Determining if well-pleaded factual allegations state a "plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and

5

common sense." *Id*. at 679.  A plaintiff's allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  The well-pleaded facts must establish more than a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff," *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and "grant all reasonable inferences in favor of the nonmoving party," *Lustgraaf v. Behrens*, 619 F.3d 867, 872-73 (8th Cir. 2010) (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009)).  But if a claim fails to allege one of the elements necessary to recovery on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted.  *See Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Although courts must accept all well-pleaded factual allegations as true, they "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

## DISCUSSION

**I.   Plaintiff's Counts III and IV state claims against Defendants Gardner and Griffin.**

### A.  42 U.S.C. § 1981 – Discharge

Section 1981 "protect[s] citizens' rights to make and enforce contracts . . . without any impairment due to private or public racial discrimination." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).  "To state a prima facie case for race discrimination under § 1981, Plaintiff must show (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination."[2] *Perkins v. Truman Med. Ctr., Inc.*,

---

[2] Under Eighth Circuit precedent, plaintiffs in reverse race-discrimination cases must also include a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 902 (8th Cir. 2015) (quoting *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004)) (applying the requirement to reverse race-discrimination claims brought pursuant to Title VII, 42 U.S.C. § 1981, and the Arkansas Civil Rights Act)).  On June 5, 2025, the Supreme Court held that "this additional 'background circumstances' requirement is not consistent with Title VII's text or our case law construing the statute." *Ames v. Ohio Dep't of Youth Servs.*, 2025 WL 1583264 (U.S. June 5, 2025).  The Court need not decide

2025 WL 756027, at *3 (W.D. Mo. March 10, 2025) (citing *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012)).  "Under § 1981, a plaintiff bears the burden of showing race was a but-for cause of his or her injuries." *Benda v. Sadler Rentals, LLC*, 2023 WL 3002402, at *3 (E.D. Mo. April 19, 2023) (citing *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020)).  "At the pleading stage in the discrimination context, it is unnecessary to plead enough facts to establish a prima facie case." *Ingram v. Arkansas Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024).  "The elements of a prima facie case are relevant, however, as they are 'part of the background against which a plausibility determination should be made.'" *Ramirez v. Coca Cola Co. of North Am.*, 2023 WL 6381412, at *2 (E.D. Mo. Sept. 29, 2023) (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)).

Defendants argue that Plaintiff has failed to plead facts plausibly demonstrating that she was terminated because of her race.  The Court disagrees.  The Amended Complaint alleges that Circuit Attorney Gardner and First Assistant Griffin sat in silence as Mentor Martin referred to Plaintiff as a "slave owner" and indicated that Plaintiff was not capable of her job because she was not black; that Gardner brought in Mr. Waheed, who justified Martin's discriminatory statements and told Plaintiff that she would never experience racism because of her white privilege; that Plaintiff was placed on unpaid leave the next day, pending an investigation into texts she had sent regarding the incident; and that Plaintiff was terminated less than a week later without explanation.  Those allegations are sufficient to plausibly allege that Plaintiff was terminated because of her race.

### B.  42 U.S.C. § 1981 – Retaliation

"A plaintiff establishes a prima facie case of retaliation under § 1981 by proving: (1) statutorily protected participation; (2) adverse employment action; and (3) a causal relationship between the two." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996). Plaintiff claims that she complained about her mistreatment directly to Gardner when she stated during the meeting, "I'm feeling attacked because I'm not Black."  Plaintiff also claims that she complained about her treatment in text messages to Attorney Myers.  Defendants argue that

---

whether the Supreme Court's decision should extend to claims of discrimination brought pursuant to § 1981.  Assuming, without deciding, that the "background circumstances" requirement continues to apply to reverse race-discrimination claims under § 1981, the Court still finds that Plaintiff has plausibly alleged that she was terminated because of her race.

Plaintiff "had no objectively reasonable basis to believe she was subjected to an actionable hostile environment." Doc. [23] at 14.

"An individual making a complaint must have an objectively reasonable belief that an actionable [§ 1981] violation has occurred for the complaint to qualify as a protected activity." *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1064 (8th Cir. 2020). "This reasonableness assessment is made 'in light of the applicable substantive law.'" *Id*. at 1065 (quoting *Brannum v. Mo. Dep't. of Corr.*, 518 F.3d 542, 548-49 (8th Cir. 2008)). To determine whether the hostile environment is actionable, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "The court may also consider the 'physical proximity to the harasser, and the presence or absence of other people.'" *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 943 (8th Cir. 2010) (quoting *Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir. 1999)). "The workplace must be 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Singletary v. Mo. Dep't of Corr.,* 423 F.3d 886, 892 (8th Cir. 2005)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotation marks omitted).

The Court finds *Pye v. Nu Aire, Inc.*, 641 F.3d 1011 (8th Cir. 2011), instructive. There, an African American employee asked the company's payroll administrator to fill out a two-page employment verification form that he needed to qualify for housing assistance. *Id*. at 1015. When he returned a week later for the form, the administrator told him to come back later as she had not gotten around to completing the form. *Id*. Plaintiff tried to explain his situation to the administrator, but she told him that "she did not really care about his situation and referred to the form as 'dumb.'" *Id*. Plaintiff left but then returned to ask a question. *Id*. "While [plaintiff] was standing in the doorway, before [the administrator] realized he had returned, he saw [the administrator] sitting at her desk looking at papers and heard her say 'nigger goon.'" *Id*. The administrator then saw plaintiff and "hurriedly filled in parts of the form, faxed it to the county, and gave [plaintiff] a copy." *Id*. Plaintiff filed an internal discrimination complaint, and the

8

matter was investigated. *Id*. at 1016.  Plaintiff was terminated soon thereafter. *Id*.  According to the Court, plaintiff failed to support a hostile work environment claim because "the racial term used by [the payroll administrator], while entirely inappropriate and offensive, was a one-time occurrence by a non-supervisor, and was not made directly to Pye." *Id*. at 1018.  Plaintiff's retaliation claim survived summary judgment, however. *Id*. at 1020.  The Court cited *Helton v. Southland Racing Corp.*, 600 F.3d 954, 961 (8th Cir. 2010), for the proposition that "reporting alleged harassment was protected conduct for purposes of a retaliation claim, [even] where [the] alleged harassment did not itself constitute an actionable wrong." *Pye*, 641 F.3d at 1020.

The conduct Plaintiff complains of is more severe than that alleged in *Pye*.  Mentor Martin's comments were made directly to Plaintiff in a room filled with co-workers, including her supervisors, First Assistant Griffin and Circuit Attorney Gardner, who sat in silence as Plaintiff was called a "slave owner" and told she was incapable of doing her job because of her skin color.  Plaintiff has plausibly alleged that she had an objectively reasonable belief that an actionable § 1981 violation had occurred.

Defendants also argue that Plaintiff's text messages to Attorney Myers cannot constitute protected activity because the texts did not constitute "opposition."  In one of the texts, Plaintiff states: "I [was] not worried about what I sent because once again my intent was talking to someone I thought was a friend.  I had no idea it would be seen by anyone else." Doc. [16] ¶ 144.  According to Defendants, "[t]his is not protected opposition; it is venting to a friend." Doc. [23] at 18.  In support, Defendants cite *Green v. City of Pine Bluff, Arkansas*, 105 F. Appx. 880, 882 (8th Cir. 2004), in which the plaintiff failed to establish a prima facie case of retaliation because she had "not reported any of the harassing behavior to her supervisors or anyone 'up the chain of command.'"  Plaintiff claims that, like the plaintiff in *Green*, Plaintiff did not oppose actionable misconduct: "Plaintiff's messages to her friend, messages she did not intend to be seen by anyone else, were not opposition to conditions she found to be actionable because it was her express desire that her messages not be shared." Doc. [23] at 18.

But unlike the plaintiff in *Green*, Plaintiff reported the harassing behavior to Attorney Myers, who "at times exercised some degree of supervisory authority over [Plaintiff]." Doc. [16] ¶ 66.  Defendants cite no other authority for their claim that Plaintiff's text messages do not constitute "opposition" solely because Plaintiff thought the messages would stay private.  As such, the Court declines to dismiss an otherwise colorable claim based on that argument.

9

Defendants also claim that the text messages do not constitute protected activity because they threatened a co-worker's employment.  Doc. [23] at 19.  According to Defendant, "[t]he Circuit Attorney was free to terminate Plaintiff for vowing to make the termination of her co-worker her mission."  *Id*.  Defendants' arguments are more appropriate for the summary judgment phase.  "[F]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."  *Wilson v. Arkansas Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (quoting *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015)).  At the motion to dismiss stage, the Court considers "whether there are lawful, obvious alternative explanations for the alleged conduct that would render [Plaintiff's] complaint implausible . . . [, but] not every potential lawful explanation for the defendant's conduct renders the plaintiff's theory implausible."  *Id*. (cleaned up).  "While the factual allegations here may be consistent with termination for [misconduct], they are not an 'obvious alternative explanation' that render [Plaintiff's] claim implausible."  *Id*. at 374.  Because Plaintiff's allegations "'permit[ ] the court to infer more than the mere possibility of misconduct,'" Plaintiff's retaliation claim is not subject to dismissal.  *Id*. (citing *Iqbal*, 556 U.S. at 679).

### C. Claims against First Assistant Griffin

Finally, Defendant Griffin argues that there is "no plausible allegation that she made, influenced, or instigated the decision to terminate Plaintiff."  Doc. [23] at 19.  Defendant Griffin points to the following allegations:

> At all relevant times Kimberly Gardner is and has been the duly elected and serving Circuit Attorney for the City of St. Louis, ("the City").
>
> Gardner has the authority to hire and fire within her office.
>
> Gardner, *acting through Griffin*, fired Goetz because Goetz is White and because Goetz protested to being subject to racial discrimination.

Doc. [16] ¶¶ 4, 8, 188 (emphasis added).  According to Defendant Griffin, such allegations show that it was Circuit Attorney Gardner's decision to terminate Plaintiff, not Griffin's.  First Assistant Griffin also takes issue with Plaintiff's use of "and/or" in her pleadings.  *See, e.g.*, Doc. [16] ¶ 232 ("Kimberly Gardner and/or Serena Griffin discharged Plaintiff").  Griffin claims that Plaintiff's use of "'and/or' with respect to Ms. Wilson-Griffin's role obscures Plaintiff's own admission that [ ] Ms. Gardner, not Ms. Wilson-Griffin, made the decision to terminate Plaintiff."  Doc. [23] at 20 n. 1.

10

The Court agrees with Plaintiff that Defendant Griffin's argument ignores the portions of Plaintiff's Complaint that plausibly allege Griffin's involvement in the decision to terminate Plaintiff. Moreover, as Plaintiff notes, the Federal Rules of Civil Procedure permit pleading in the alternative, which is particularly useful in situations such as here where Plaintiff does not "know at the time of pleading which, if any, parties are liable for the injuries . . . ." *Suffern v. Jackson Fam. Clinic, Inc.*, 2009 WL 10730242, at *4 (E.D. Mo. Sept. 10, 2009). Defendant Griffin's motion to dismiss the claims against her is denied.

II.  **Plaintiff's Counts I, II, and V successfully state claims against the City of St. Louis.**

   A.  Title VII – Discharge and Retaliation

The City of St. Louis asserts that Plaintiff's Counts I and II are subject to dismissal because the City of St. Louis was not Plaintiff's employer for purposes of Title VII. The City relies heavily on *Harris v. City of St. Louis*, 2012 WL 886824, at *8 (E.D. Mo. Mar. 15, 2012), in which the court considered a number of factors to determine whether the City or the 22nd Judicial Circuit was the plaintiff's employer. But in *Harris*, this issue was originally raised in a motion for judgment on the pleadings. *See Harris v. City of St. Louis*, 2011 WL 1885387, at *6 (E.D. Mo. May 18, 2011). The Honorable Rodney W. Sippel denied defendant's motion stating: "I agree with [plaintiff] that, in this case, the decision of whether the City of St. Louis is [plaintiff's] employer should not be made without the benefit of discovery on the issue." *Id*. The Court agrees with Judge Sippel's sound approach. *See also Alexander v. Stratus Bldg. Sols.*, 2014 WL 6673517, at *3 (E.D. Mo. Nov. 24, 2014) (the issue of whether plaintiff was an independent contractor or employee for purposes of Title VII or the ADEA was "more appropriate for consideration on a motion for summary judgment" because "pertinent facts about the working relationship between [plaintiff] and [the alleged employer] are not before the court"). The City's motion to dismiss Counts I and II is denied.

   B.  42 U.S.C. 1981 – *Monell* Liability

In Count V, Plaintiff brings a *Monell* claim on the basis that Defendant Gardner's firing was the act of "an authorized high-level decision maker." Doc. [16] ¶¶ 188-90. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "Authority to make municipal policy may be granted directly by a legislative enactment

11

or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id*. at 483.

The City claims that Plaintiff's Complaint is "devoid of any factual allegations substantiating that, as a matter of Missouri law, Gardner is a final policymaker for the City." Doc. [24] at 13.  In support, the City relies on the United States Supreme Court's decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).  *Id*.  According to Defendant, "the United States Supreme Court has identified the City's authorized high-level decision makers for § 1983 purposes in the employment context, and they are the Mayor and the Board of Aldermen, not Gardner."  Doc. [35] at 7.

In *Praprotnik*, the "Supreme Court, in a plurality opinion, held that [the Eighth Circuit] had applied an improper legal standard for determining municipal liability, and reversed [the Eight Circuit's] finding that the City of St. Louis was liable under 42 U.S.C. § 1983 for the decisions of its subordinate city officials to transfer and later terminate James H. Praprotnik, the appellee." *Praprotnik v. City of St. Louis*, 879 F.2d 1573, 1574 (8th Cir. 1989).  The Supreme Court, "finding no evidence of an unconstitutional municipal policy or evidence that final policymaking authority actually rested with the supervisors responsible for Praprotnik's transfer and termination, . . . reversed and remanded the case for further review of the record and state law." *Id*.  On remand, the Eighth Circuit found that, pursuant to Article XVIII of the St. Louis City Charter, the Civil Service Commission "possesses primary policymaking authority for making general personnel policy and for making final decisions as to individual employees." *Id*. at 1575-76.  The Court also found that there was no evidence that the Commission delegated its authority to any of the supervisors responsible for the plaintiff's transfer and termination.  *Id*. at 1576.  The Court noted that the Commission is "empowered to make decisions with respect to the adoption, administration and enforcement of the city's civil service rules, i.e., rules and procedures for handling personnel and employment matters." *Id*. at 1575.  The Commission is also "authorized to make recommendations to the mayor and aldermen with respect to ordinances affecting personnel matters, to investigate issues affecting personnel administration, and to decide *all* employment matters raised on appeal from any act or decision by the Director of Personnel or appointing authority." *Id*. (emphasis in original).

The City's argument that Defendant Gardner is not a final policymaker appears to conflict with the arguments it raised in response to Plaintiff's Title VII claims.  In response to Plaintiff's Title VII claims, the City states, in relevant part:

> Section 56.540 authorizes the Circuit Attorney to appoint CAO employees, including assistants, investigators, and clerical employees.  This section gives the Circuit Attorney the authority to direct these employees to perform their job duties, as well as "perform other services as the circuit attorney may direct."  RSMo. § 56.540.2.  The Circuit Attorney's appointed assistants are subject to the "direction" and "control" of the Circuit Attorney.  RSMo. § 56.550.  CAO employees hold office from month to month at the Circuit Attorney's pleasure, and the Circuit Attorney may remove them at any time.  RSMo. § 56.570.  Accordingly, employees like Goetz are not civil service employees of the City, but at-will employees of the Circuit Attorney.
> . . .
> Moreover, Goetz's pleadings make clear she is not part of the City's civil service system or entitled to take advantage of its grievance process – Gardner had the full authority, according to the First Amended Complaint, to terminate Goetz's employment without Goetz having any recourse to appeal to the City's Civil Service Commission or file a grievance.  Doc. # 16, ¶176 (referencing Goetz's "at-will employment"); *Id*.

Doc. [24] at 8.  Plaintiff responds, in pertinent part:

> Plaintiff also agrees with the City that under Missouri's statutes a Circuit Attorney shall be elected, RSMo. § 56.430, that the Circuit Attorney must prosecute crime, RSMo. § 56.450 and 460, that persons working in the Circuit Attorney's office serve at her pleasure, RSMo. § 56.570, (which means they are not civil service employees), and that persons working in her office are subject to her direction and control, RSMo. § 56.550.

Doc. [28] at 10.

All parties seem to agree that Plaintiff has alleged she is not part of the City's civil service system.  Unlike in *Praprotnik*, then, Defendant Gardner's decision to fire Plaintiff was not reviewable by the Civil Service Commission.  Instead, pursuant to state law, Plaintiff served "during the pleasure of the circuit attorney," and could "be remov[ed] at any time by the circuit attorney, at [her] option."  Mo. Rev. Stat. § 56.570.  Defendant Gardner's authority to fire Plaintiff "was not constrained by any other policymaker."  *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir. 1988).  The Court is therefore unpersuaded that Defendant Gardner did not "possess[ ] final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481.

The City also argues that "[e]ven if Gardner was such an authorized decision maker, the First Amended Complaint does not allege this theory of recovery against the City."  Doc. [35] at

13

7, 8. At the end of her Complaint, Plaintiff includes a section for her *Monell* claim against the City. The section includes the following allegations:

> 246. Plaintiff incorporates all prior paragraphs.
>
> 247. First, that the Defendants deprived the Plaintiff of her constitutional rights . . . ; and
>
> 248. Second, the deprivation of the Plaintiff's constitutional rights directly resulted from either (1) an official written policy of the Defendant or (2) an unofficial custom;
>
> 249. Third, Plaintiff sustained damage.
>
> WHEREFORE, as a direct and proximate result of ***Griffin's*** violations of 42 U.S.C. 1981, plaintiff has suffered the damages set forth in the Damages section of this Complaint and seeks the relief stated in the Relief section of this Complaint, particularly compensatory damages against the City of St. Louis.

Doc. [16] ¶¶ 246-49 (emphasis added). Because Plaintiff clearly alleges elsewhere in her Complaint that her *Monell* claim against the City is based on Circuit Attorney Gardner's actions as a policymaker, the Court will grant Plaintiff leave to amend her Complaint to address the mistaken naming of Griffin instead of Gardner in her *Monell* claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motions to dismiss, Docs. [22], [25], are **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff shall file an amended complaint **no later than June 18, 2025**.

**IT IS FINALLY ORDERED** that the parties shall file a proposed joint scheduling plan **no later than June 27, 2025**.

Dated this 6th day of June, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE